**Douglas B. BRAATEN, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–279.

Court of Appeals of Alaska.

Sept. 6, 1985.

---

Mark E. Ashburn, Bailey & Mason, Anchorage, for appellant.

Cynthia M. Hora, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Douglas Braaten was convicted of first-degree sexual assault, AS 11.41.410(a)(1). He appeals his conviction and sentence. We affirm the conviction, but find it necessary to remand for further sentencing proceedings.

## I. FACTS

G.J. testified at trial that on Sunday, July 10, 1983, she attended a union picnic. At the picnic she met a man to whom she gave her telephone number. On Saturday, July 16, 1983, G.J. received a telephone call. The caller asked if she knew who this was; G.J. replied she thought it was the man she met at the picnic. The caller replied that he was the man from the picnic. G.J. had talked to the man at the picnic about the Pines Club, and she asked the caller if he had looked for her at the Pines Club since they had met. The caller said he had. The two talked about going to the Pines Club that evening, but the plan was never definite and, in fact, never materialized.

In the early morning hours of July 21, 1983, G.J. was awakened by a telephone call from the man she had talked to on the 16th. She asked him what time it was; he said it was 2:30. She asked him why he was calling, and he said that he was sorry for calling, but that his mother had died, that he was upset, and that he needed someone to talk to. G.J. eventually agreed to let the caller come over, and gave him directions to her apartment.

G.J. waited in the living room. She soon received another call asking for better directions from a nearby Qwik Stop. Shortly thereafter, she heard a truck pull up to her building, and went out into the hall, expecting to see the man she had met at the picnic. The man who walked into the building, however, was definitely not the man G.J. had met at the picnic. G.J. asked this man who he was looking for, and he responded, "Bob." G.J. then went back into her apartment and shut the door. A short time later, there was a knock at G.J.'s door.

When she answered it, the man who had been in the hallway told her that "Bob" had not answered his door, and asked to use her phone to call "Bob." She allowed him to use the phone, which was by the door, and left the door open. The man dialed twice, unsuccessfully, and then asked to use G.J.'s bathroom. When he returned, he dialed six numbers, then hung up. G.J. then told him he should leave. The man walked toward the door and then slammed it shut and knocked G.J. to the floor. He told her he would cut her with a knife or smother her if she tried to scream. During the struggle the man pulled G.J.'s hair, scratched her face and apparently bit her on the head. He dragged her into the bedroom and forced her to have intercourse three times. G.J. eventually convinced the man to leave by assuring him that she would not call the police and telling him that she was still his friend.

G.J. put on her robe and went upstairs to a friend's apartment. The friend testified at trial that G.J. had scratches on her face and neck and teeth marks on her head which were bleeding. G.J. was very upset, and told the friend that she had been raped and that she wanted to talk to her parish priest. G.J. called her priest and told him she had been raped by a man she did not know. The priest advised her to call the police, which she did.

G.J. gave a description of the man who had assaulted her to the police. In particular, she told the police that her assailant was wearing a black shirt with the word "Nike" printed on it, and that he had sores on his stomach.

The officer interviewing G.J. remembered seeing a photograph of a man wearing a Nike shirt in connection with another case. The officer located the picture, which was taken in the course of an investigation of a sexual assault on May 11, 1983. The photo was of Douglas B. Braaten. Because Braaten matched the description given by G.J. in other respects, the officer prepared a photographic line-up and showed it to G.J., who quickly identified Braaten.

Braaten testified at trial that he met G.J. at the Pines Club on July 1, 1983. He got her telephone number that night, and called her a few weeks later. He called her in the early morning hours of July 21st, and she invited him over. After they talked for awhile, G.J. suggested Braaten stay, and walked towards the bedroom. The sexual activity that followed was consensual, according to Braaten. When he got up to leave, she asked him if they would·see each other again, and he told her that he didn't think so because he was engaged. She became upset and Braaten left.

Following Braaten's conviction, the state filed notice of presumptive sentencing and of three aggravating factors under AS 12.-55.155. Braaten was subject to a presumptive term of eight years. AS 12.55.125(i). Superior Court Judge Ralph E. Moody found the existence of the three statutory aggravators, and sentenced Braaten to twenty years with twelve years suspended.

## II. PHOTO OF BRAATEN IN THE NIKE T-SHIRT

Braaten first argues that the manner in which the state introduced the photo of Braaten taken in connection with the earlier investigation was prejudicial, because it suggested prior bad acts. *Oksoktaruk v. State*, 611 P.2d 521, 524 (Alaska 1980).

### A. Proceedings

Prior to trial, defense counsel indicated that he had not been provided with reports of the prior sexual assault investigation focused on Braaten. Counsel stated that while the prosecution had agreed not to introduce anything from the reports unless the defense "opened the door," the defense should still be able to examine those reports. The state initially refused to turn over the reports. The court ruled that since Braaten knew about the investigation in May (and also about an earlier investigation that was the subject of other reports held by the prosecution), the reports would really be of no use to him. The court went on to rule:

I think the state's position is well taken in this case, but with this understanding. You cannot bring it up and cross examine until you've shown me the relevancy of it. If you can show the relevancy, the defendant will then be given these statements, and if they can show reason for a continuance, they will be given a continuance.

The court also stated that the reports "will be sealed as having been examined in-camera by the court, and it may very well become relevant at some other time."

In his opening statement, the prosecutor stated:

Now, in addition to the description of the man's clothes—remember the Nike shirt. In addition to that [G.J.] also told the police that her assailant had what she thought were red sores on his belly. And the police, when the case was turned over to—to Dave Sherbahn, who was a sergeant head of the sensitive crimes unit, the rape unit, of the Anchorage Police Department, when he interviewed her, he got more information from her. She was not able to ever put a name on the person. *But he's going to tell you that he came across a picture of the· defendant, Doug Braaten, that was taken before the night of the rape wearing a shirt that had those letters written on it.* And based on that, and based upon her description of the man, the size and weight and the little mustache, he thought that it was a good possibility that Doug Braaten was the man that had assaulted her. The police secured—went back and they put on what they called a photo lineup. They wanted to just see if they had the right guy. [Emphasis added.]

Defense counsel objected and moved for a mistrial on the grounds that this statement by the prosecutor suggested a prior police contact and essentially involved the reports that the defense had been unable to discover. The court ruled that since the prosecutor did not refer to the source of the photo located by Officer Sherbahn, there was no problem, and no grounds for mistrial. The prosecutor stated that he wasn't aware that the photo came from the undisclosed investigation, but he agreed to

check. When he found out that the photo was taken in connection with that case, the prosecutor turned over the police reports to defense counsel. In further discussions, the prosecutor stated that he had no intention of putting on anything in reference to the investigation in the case-in-chief except for the photograph itself.

The prosecutor went on to make an offer of proof to establish that the photograph should be admitted. He explained the circumstances under which the photo was taken. Defense counsel then offered to stipulate that Braaten had the Nike T-shirt before July 21, stating that he couldn't understand how the prosecution would be able to introduce the photo without in some way suggesting the prior investigation.[1] Defense counsel pointed out that the crucial part of the state's evidence was going to be the photographic lineup, and that the source of the photograph used in the lineup was essentially irrelevant. The prosecutor refused to stipulate, and Judge Moody stated he would not force the prosecution to accept the stipulation. Defense counsel was granted a brief continuance on the basis of the newly disclosed reports.

Immediately before the state was going to call the officer who had taken the picture of Braaten in May, defense counsel renewed his objection. The prosecutor argued that the picture was relevant, that it would have been relevant regardless of who had taken it, and that Officer Feichtinger's testimony was necessary to lay a foundation for the photograph's introduction. The prosecutor stated:

> The fact that it was obtained by the police officer, as I say, is fortuitous. We certainly have no intention of even mentioning any other police contact. This is simply not a bad act. We're not going to get into it, Judge.

Judge Moody ruled again that the photograph was admissible, and Feichtinger was called to testify. Feichtinger stated that

he met Braaten on May 11, 1983, and gave a description of how Braaten was dressed that day, including the Nike T-shirt. The prosecutor showed Feichtinger the photograph, and he stated that he had taken it on May 11. This was the extent of Feichtinger's testimony; there was no cross-examination.

The prosecutor next called Sergeant Sherbahn. Sherbahn was first asked his position and he replied that he was the supervisor in charge of the sexual assault unit. Sherbahn was then questioned about his interview with G.J. on July 21. In recording G.J.'s description, Sherbahn wrote "Knight" instead of "Nike." He realized his mistake later and, according to his testimony, this caused him to recall seeing a photograph of someone wearing a Nike T-shirt. Sherbahn was then allowed to testify that he subsequently obtained the photograph that he remembered seeing and that he was able to associate a name with the photograph and eventually to arrange a photographic lineup. Sherbahn went on to testify that G.J. identified Braaten from the photographic lineup, and that the T-shirt and other items of clothing were later seized from Braaten's apartment pursuant to a warrant. The shirt and other items were ultimately introduced into evidence.

**B. Analysis**

Alaska Rule of Evidence 404(b) provides:

(b) *Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The parties have analyzed this case with reference to Evidence Rule 404(b) and *Ok-*

---

**1.** Although Braaten ultimately testified that he was the person who had intercourse with G.J., Braaten's concession on the issue of identity was apparently not clear until his testimony at the end of the trial. We note that Braaten's

counsel did not make an opening statement until after the state rested and that Braaten's counsel did not offer to stipulate on the issue of identity.

*soktaruk v. State*, 611 P.2d at 524. We have recently stated:

> The exclusionary provision of Evidence Rule 404(b) represents the "presumption in our law that the prejudicial effect of introducing a prior crime outweighs what probative value may exist with regard to propensity. No case by case balancing is permitted." *Oksoktaruk v. State*, 611 P.2d 521, 524 (Alaska 1980). When, however, a prior bad act is relevant to a material fact other than propensity, the court may admit the evidence if an Evidence Rule 403 balancing shows the evidence to be more probative than prejudicial. In making this balance, the Alaska Supreme Court has cautioned that "[i]f prior crimes were found admissible whenever offered to prove a fact classified as material to the prosecution's case, 'the underlying policy of protecting the accused against unfair prejudice ... [would] evaporate through the interstices of the classification.'" *Oksoktaruk*, 611 P.2d at 524, *quoting* E. Cleary, *McCormick on Evidence* § 190, at 453 (2d ed. 1972). The trial court's inquiry, then, is two-fold. First, the court must determine that the evidence sought to be admitted has relevance apart from propensity. Second, the court must determine that the nonpropensity relevance outweighs the presumed highly prejudicial impact of the evidence. *Freeman v. State*, 486 P.2d 967, 977–79 (Alaska 1971). If there is no genuine nonpropensity relevance, the balancing step is never reached.

*Lerchenstein v. State*, 697 P.2d 312, 315 (Alaska App.1985) (footnote omitted).[2]

■ It appears to us that there was no need to introduce evidence that Officer Feichtinger took the picture of Braaten or that Sergeant Sherbahn recalled seeing it. These facts had no probative value. The prosecution could have established the relevant fact, that this was a photograph of Braaten taken on a particular date, by means of the defense stipulation. By allowing the prosecution to show the circumstances under which the photograph was taken, the court ran the risk that the jury might infer that Braaten had been the subject of another investigation. We therefore believe that the preferable procedure would have been to have accepted the defense stipulation to help avoid the risk that the jury might draw the inference that Braaten might have been a suspect in another case. Although we conclude that accepting the defense stipulation would have been the preferable procedure, we conclude that any error in allowing the testimony on how the photograph was obtained did not appreciably effect the jury's verdict and was harmless error. *Love v. State*, 457 P.2d 622 (Alaska 1969). There was no testimony that Braaten was a suspect in another investigation or that the photograph was taken in connection therewith. It is quite possible that the jurors did not draw any inference that the picture might have been taken as part of another investigation. Even if the jurors did draw that inference, they would not know the circumstances of the former investigation. It seems highly unlikely that a juror would put any weight on the fact that Braaten's picture had been taken as part of another investigation even if the juror drew that inference. We therefore conclude that the error was harmless.

### III. PHOTO OF BRAATEN'S STOMACH

Before trial, the state obtained permission to introduce a photo of Braaten's stomach taken after his arrest. The photo was admitted mainly to show that Braaten had sores on his stomach, as described by G.J. during her interview with police. Braaten offered to stipulate that G.J. had identified the sores in the photo as being the same as the sores on the stomach of her attacker.

---

**2.** Alaska Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Braaten argues on appeal that Judge Moody abused his discretion in allowing introduction of the photograph. *Stevens v. State*, 443 P.2d 600, 603 (Alaska 1968), *cert. denied*, 393 U.S. 1039, 89 S.Ct. 662, 21 L.Ed.2d 586 (1969). He emphasizes that the prosecutor made some questionable arguments based on the photo at the close of the evidence, and that the photo was cumulative evidence, in the sense that there was much stronger identity evidence available to the prosecution. While the closing arguments were probably improper, Braaten has failed to demonstrate the potential for substantial prejudice arising from the photo itself. Judge Moody did not abuse his discretion in admitting the photo of Braaten's stomach.

### IV. POLICE REPORT ON ACTIVITIES OF G.J.

Braaten next contends that he was improperly denied discovery of police reports relating to G.J.'s activities.

#### A. Proceedings

Sometime after the alleged assault, Braaten told his roommate, Mike Crawford, that he had met G.J. over the weekend of July 4th at the Pines Club. Crawford testified to this before the grand jury. Police apparently investigated the story by asking G.J. about her activities that weekend, then contacting people G.J. said she was with in order to corroborate her story. While discussing possible discovery of Braaten's prior police contacts, the prosecutor brought up a potential discovery problem arising out of the statement made to Crawford and the resulting investigation. Judge Moody stated initially that the prosecutor would have to make reports available as soon as he had them. The prosecutor persisted in arguing that he shouldn't be required to turn over the reports until they were made technically relevant by Braaten's direct testimony that he met G.J. over that weekend. Judge Moody finally stated that the prosecutor should either disclose whatever he found out or bring it to the court to show why it should not be disclosed.

Later that day, the prosecutor brought in two typewritten sheets containing what appears to be a summary of G.J.'s version of her activities, July 1 through July 4. Someone wrote "Not discoverable" at the top of the first sheet before the two sheets were presented to Judge Moody. There were xerox copies of charge slips attached to the two pages; these were apparently made from G.J.'s copies, and supported her version of her activities. The prosecutor stated that he still believed the material was not discoverable, and that he was complying with the court's ruling, which he characterized as follows:

> [T]he court ruled ... that if a witness who we anticipated calling on direct has any information, even information that might possibly come out on ... on perhaps rebuttal, but only on rebuttal, that I was to approach the court and give it to the court to decide whether or not it was discoverable.

Since the two pages contain nothing that suggests G.J. ever met Braaten, Judge Moody ruled that they were not discoverable. Defense counsel argued further, and the prosecutor admitted he might use the report or something connected to it on rebuttal. Judge Moody ruled finally that if the prosecutor did try to introduce the material at any stage, the court would entertain a motion for continuance.

G.J. testified at trial that she had never met Braaten before July 21.

Immediately before the defense case, counsel stated that Braaten was going to take the stand and testify that he had met G.J. earlier. Based on this fact, counsel asked again for discovery of the report prepared on G.J.'s activities and/or a continuance. The court ruled that it still was not discoverable material.

Braaten testified that he met G.J. at the Pines on Friday, the 4th of July weekend. He was with a friend, Allen Getz. According to Braaten, he called G.J. a few weeks later, and they made a tentative date which never materialized because Braaten had to work late. On cross-examination, Braaten maintained that he met G.J. at the Pines on

July 1, and that she gave him her telephone number. According to Braaten, the slip of paper was destroyed, so he looked her number up in the phone book, and later destroyed or lost the second slip. The prosecutor asked why Getz was not there to testify, and Braaten answered that Getz had told him he could not really identify either G.J. or the other woman the two men danced with on July 1. On rebuttal, the state called only Sergeant Sherbahn, who testified that a thorough search was made of Braaten's apartment at the time the warrant was executed for, *inter alia,* any slip of paper with G.J.'s telephone number.

### B. Analysis

Alaska Rule of Criminal Procedure 16(a) provides:

(a) *Scope of Discovery.* In order to provide adequate information for informed pleas, expedite trial, minimize surprise, afford opportunity for effective cross-examination, and meet the requirements of due process, discovery prior to trial should be as full and free as possible consistent with protection of persons, effective law enforcement, and the adversary system.

Alaska Rule of Criminal Procedure 16(b) provides in relevant part:

(b) Disclosure to the Accused.

(1) *Information Within Possession or Control of Prosecuting Attorney.* Except as is otherwise provided as to matters not subject to disclosure and protective orders, the prosecuting attorney shall disclose the following information within his possession or control to defense counsel and make available for inspection and copying:

 (i) The names and addresses of persons known by the government to have knowledge of relevant facts and their written or recorded statements or summaries of statements;

 . . . .

(3) *Information Tending to Negate Guilt or Reduce Punishment.* The prosecuting attorney shall disclose to defense counsel any material or informa-

tion within his possession or control which tends to negate the guilt of the accused as to the offense or would tend to reduce his punishment therefor.

 . . . .

(7) *Other Information.* Upon a reasonable request showing materiality to the preparation of the defense, the court in its discretion may require disclosure to defense counsel of relevant material and information not covered by subsections (b)(1), (b)(2), (b)(3), and (b)(6).

The discussion at trial seemed to involve both Rule 16(b)(1)(i) and (b)(3). On appeal, Braaten cites the sections quoted above, but concentrates upon Rule 16(b)(1)(i).

Also relevant to this issue is Criminal Rule 16(d)(6), which provides:

Upon request of any party, the court may permit

 (i) any showing of cause for denial or regulation of disclosure, or

 (ii) any portion of any showing of cause for denial or regulation of disclosure to be made to the court in camera ex parte. A record shall be made of such proceedings. If the court enters an order granting relief following such a showing, the entire record of the proceedings shall be sealed and preserved in the records of the court, to be made available to the supreme court in the event of an appeal.

In *Braham v. State,* 571 P.2d 631 (Alaska 1977), *cert. denied,* 436 U.S. 910, 98 S.Ct. 2246, 56 L.Ed.2d 410 (1978), the supreme court set forth standards and procedures to be used in applying Criminal Rule 16. Based upon considerations of due process and compulsory process, the court reached the following conclusions regarding the rule.

Non-disclosure was proper only if (1) the prosecution showed that discovery of the evidence would be inconsistent with protection of persons or enforcement of the laws and (2) the trial judge concluded that the material was not relevant to the defense. If the district attorney failed to show that disclosure would harm en-

forcement or protection efforts, the material must be disclosed. The question of relevance would then be decided in an adversary context; both counsel would have the opportunity to make their respective arguments.

Disclosure is also required if the judge's in camera inspection showed that the material was relevant to the defense—whether or not the prosecutor had demonstrated that discovery would be inconsistent with enforcement or protection efforts. In the latter circumstance, the state must decide between continuing to prosecute, while incurring the problems posed by disclosure, and terminating the prosecution in order to maintain the material's secrecy.

*Id.* at 643. [Footnotes omitted.]

■ The prosecution in this case made no showing that discovery would be inconsistent with protection of persons or enforcement of the laws. While it may be concluded that Judge Moody found that the report was not relevant under any subsection of Rule 16(b), we believe that under the approach set forth in *Braham,* the court was required to disclose the report without reaching this question, in light of the provision of Rule 16(b)(1)(i). The two page report submitted by the prosecutor was apparently a summary of G.J.'s statements to the police concerning her activities during the period Braaten claimed he met her. The complaining witness, G.J., was clearly a person "known by the government to have knowledge of relevant facts," so that the summary of her statements on any area of the investigation would seem to fall within the scope of Criminal Rule 16(b)(1)(i). *See also Mahle v. State,* 371 P.2d 21, 22–24 (Alaska 1962) (police reports of oral statements by witnesses should have been disclosed under former statute governing discovery). We hold that, in the absence of a showing by the prosecutor under Criminal Rule 16(d)(6), the court should have allowed discovery of the report.

Our conclusion is bolstered by the supreme court's decision in *Howe v. State,* 589 P.2d 421 (Alaska 1979), where the court discussed the duty of the prosecution to disclose names, addresses and statements by persons who have relevant knowledge, but who might not be called to testify, or who might not be called until the rebuttal portion of trial. The supreme court stated in *Howe* that

> [t]he relevance criterion expressed in Criminal Rule 16(b)(1)(i) will ... justify non-production of the names of rebuttal witnesses whose knowledge was reasonably not thought to be germane to the case until a position taken by the defense during trial made it so.

*Id.* at 424. The court held in *Howe* that the trial court erred in refusing to compel discovery of a report prepared by a psychiatrist hired by the state.

■ The state argues that discovery of material relating to G.J.'s whereabouts was not compelled until the matter was made formally relevant by Braaten's testimony. We believe this argument is foreclosed by *Howe.* It was certainly clear before trial that there was a strong possibility that Braaten would testify as he did. Thus, the state may not argue that the contents of the report were not thought to be germane. The state had a duty to disclose, and it existed "at an early stage in the proceedings." *Id.* at 424.

■ We hold that the court should have allowed discovery of the report brought in by the prosecutor. We note also that Braaten asked for all reports prepared in connection with that part of the investigation, and that the prosecutor brought in only a document which appears to be a summary of G.J.'s statements, even though he had earlier stated or implied that other persons were questioned regarding G.J.'s activities. Under these circumstances, the court should probably have inquired whether there were more reports in the prosecutor's possession. A defendant contesting a discovery ruling is hampered by his lack of knowledge of the precise nature of the information within the prosecutor's control. For this reason, an *in camera* examination of the material submitted by

the prosecutor must involve more than a cursory determination that the material is not exculpatory. Where there is a suggestion that the prosecutor has not submitted all the requested material, the court should inquire further.

■ However, the particular circumstances of this case also compel us to the conclusion that the error was harmless. Braaten's testimony that he met G.J. on July 1, at the Pines, was entirely uncorroborated. The state called no new witnesses on rebuttal, nor did the prosecutor introduce any information taken from the two-page report submitted to the court. Thus, little prejudice could have resulted from the court's ruling on this score. The report itself does not contain any exculpatory material,[3] nor is there any reason to believe that any other statements taken by police in connection with this matter disclosed exculpatory information. In light of the lack of prejudice and the limited usefulness of the report itself, we believe that the error was harmless. *See Spencer v. State,* 642 P.2d 1371 (Alaska App.1982).

## V. SENTENCE

Braaten challenges two of the three aggravators found by Judge Moody. He also argues that Judge Moody failed to explain the relative weights he attached to the aggravating factors, and that the twelve-year increase rendered the sentence excessive, even though it was suspended.

### A. "Victim Particularly Vulnerable"

■ Alaska Statute 12.55.155(c)(5) sets forth the following factor in aggravation of the presumptive term:

(5) the defendant knew or reasonably should have known that the victim of the offense was *particularly vulnerable or incapable of resistance due to advanced age, disability, ill health, or extreme youth* or was for any other reason substantially incapable of exercising normal physical or mental powers of resistance. [Emphasis added.]

Braaten and the state agree that Judge Moody's finding of the aggravator set forth in AS 12.55.155(c)(5) was based solely on the fact that G.J. was in her own apartment "where she had a right to be protected."

The state argues that Judge Moody correctly construed the statute. According to the state, the phrase "particularly vulnerable" stands by itself, and the phrase "due to advanced age, disability, ill health, or extreme youth" modifies only "incapable of resistance," by virtue of the principle of statutory construction known as the "last antecedent rule." 2A C. Sands, *Sutherland on Statutory Construction,* § 47.33, at 245 (4th rev.ed. 1984).[4] Under this con-

---

**3.** Braaten makes a separate argument that information relating to G.J.'s activities

may well have been directly helpful to the defense or it may [sic] suggested lines of further investigation that would have produced relevant evidence for the defense. Defendant testified that he was with Allen Getz the evening of the July 4th weekend that he met [G.J.]. It is certainly possible that information either in the report or suggested by it would have either refreshed the memory of Mr. Getz or corroborated the testimony of the defendant on this issue.

This is apparently a reference to Criminal Rule 16(b)(3). Far from having some tendency to negate his guilt, however, the report at issue is purely inculpatory in that, if believed, it would establish that G.J. could not have met Braaten at the Pines Club. Braaten's hypothetical uses for the report are not supported; the very most Braaten could hope for out of this report would be to gain some grounds for impeaching G.J. on

a collateral matter. We are therefore not convinced that the material was discoverable solely under Rule 16(b)(3).

**4.** Section 47.33 reads in part:

Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent. The last antecedent is "the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence." Thus a proviso usually is construed to apply to the provision or clause immediately preceding it. The rule is another aid to discovery of intent or meaning and is not inflexible and uniformly binding. Where the sense of the entire act requires that a qualifying word or phrase apply to several preceding or even succeeding sections, the word or phrase will not be restricted to its immediate antecedent.

Evidence that a qualifying phrase is supposed to apply to all antecedents instead of

struction, the state argues that a victim can be found to have been "particularly vulnerable" for a reason or reasons not mentioned in the statute. We cannot agree. The state's argument presupposes that each of the two phrases can serve effectively as legal standards. In the context of the presumptive sentencing scheme, a finding that the victim was "incapable of resistance" will not generate much difficulty. A finding that the victim of a crime was "particularly vulnerable" is more likely to generate difficulty, in part because "vulnerable" is a more vague term. Prosecutors will almost always be able to make a *prima facie* case that someone who has just been the victim of a crime was vulnerable. Since the phrase in question cannot serve as an effective independent standard, we conclude the qualifying phrase applies both to "particularly vulnerable" and to "incapable of resistance."

■■■ The governing principle in this case is that penal statutes should be construed strictly in favor of the accused. C. Sands, *Sutherland on Statutory Construction,* § 59.03, at 6–7 (4th ed. 1974). We hold that a finding that the victim was particularly vulnerable under AS 12.55.-155(c)(5) may not be based solely on environmental factors such as the one presented here. Instead, we believe the section requires a finding that the victim was "substantially incapable of exercising normal physical or mental powers of resistance," either for one of the reasons listed or for some similar reason, before the aggravator can be found. Since the finding of vulnerability in this case was based solely upon an environmental factor, we hold that the court erred in concluding that the aggravator in 12.55.155(c)(5) had been established.

**B. "Most Serious Offense"**

■■■ Braaten also challenges Judge Moody's finding that the conduct constituting this offense was among the most seri-

ous included in the definition of the offense. AS 12.55.155(c)(10). Judge Moody pointed out that G.J. sustained physical injury [5] and that Braaten obtained entry by subterfuge. In addition, we note that the assault was of fairly long duration, involving three separate acts of intercourse, according to G.J., and that Braaten initially told G.J. he would cut her with a knife if she screamed and later told her he would "smother" her. On these facts, we cannot say that Judge Moody was clearly erroneous in finding Braaten's conduct "among the most serious included within the definition of the offense."

**C. Excessiveness**

Braaten was subject to an eight-year presumptive term. AS 12.55.125(i). Judge Moody imposed a sentence of twenty years with twelve suspended. Judge Moody's comments in imposing sentence were directed mainly at describing the horrible nature of the offense of sexual assault in general. He did not discuss the aggravating factors, although he did point out that Braaten assaulted G.J. "a number of times." Judge Moody recognized that Braaten was a young man, but saw this as a factor in aggravation, because Braaten still had "20 to 25 years [in which] ... to carry out these propensities." It was clear, according to Judge Moody, that Braaten would need some supervision when he got out, and that he needed substantial time hanging over his head.

■■■ We have concluded that the sentencing court erred in finding one of the three aggravating factors. Our past decisions establish that those subject to presumptive sentences should not receive sentences which deviate substantially from the presumptive term in the absence of substantial reasons in the record for such deviation. *See Juneby v. State,* 641 P.2d 823 (Alaska App.1982), *modified on other grounds,* 665 P.2d 30 (Alaska App.1983).

only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma. [Footnotes omitted.]

**5.** This was the third aggravator found by Judge Moody, AS 12.55.155(c)(1).

The mere fact that aggravating factors have been established by clear and convincing evidence does not of itself require aggravation of a sentence. *Id.*

 In this case, the court properly found two aggravators. Since the finding that the offense was "among the most serious" was based in part upon the injury sustained, however, the court should not have attached any independent significance to the physical injury aggravator. *Juneby v. State,* 665 P.2d 30 (Alaska App.1983). Thus, there was essentially only a single aggravator properly applicable. While a single aggravating factor which establishes that the defendant's conduct is substantially more aggravated than the typical offense may justify a substantial increase over the presumptive term, the sentencing court's failure to state what weights it was attaching to the aggravators in this case makes it impossible for us to conclude that the increase in this case was justified. We also conclude that the amount of suspended time which was imposed in this case was excessive. The amount of suspended time is one and a half times the presumptive term for the offense and it seems to us that this period of suspended time is excessive under the facts of this case. Therefore, on remand, we direct the superior court to impose a sentence not exceeding twelve years with four suspended.

The conviction is AFFIRMED. The sentence is VACATED and this case is REMANDED for resentencing.

BRYNER, C.J., and SINGLETON, J., concur.

BRYNER, Chief Judge, concurring.

I join in the portion of the court's opinion that deals with Braaten's claims on the merits. I concur in the result reached by the court on the sentence appeal, without joining in the views expressed in the opinion.

SINGLETON, Judge, concurring.

I join in the court's decision to affirm Braaten's conviction. I also agree that his sentence should be vacated and the case remanded for resentencing. I am troubled by the court's rationale for vacating the sentence, however, and believe additional remarks are in order to justify the relief which we grant.

Douglas B. Braaten gained access to G.J.'s home in the early morning hours of July 21, 1983, ignored her demand that he leave, physically assaulted and battered her, and ultimately forced her to have sexual intercourse with him. Braaten was indicted for and convicted of first-degree sexual assault in violation of AS 11.41.-410(a)(1). At sentencing, the trial court found three aggravating factors: G.J. sustained physical injuries as a direct result of Braaten's conduct, AS 12.55.155(c)(1); Braaten knew or should have known that G.J. was particularly vulnerable or was substantially incapable of exercising normal physical or mental powers of resistance, AS 12.55.155(c)(5); and Braaten's conduct was among the most serious included in the definition of the offense of which he was convicted, AS 12.55.155(c)(10). Braaten was sentenced to twenty years' imprisonment with twelve years suspended.

Braaten appeals, *inter alia,* on the ground that the trial court erred in increasing his sentence based on the application of two aggravators: that G.J. was particularly vulnerable and that Braaten's conduct was among the most serious included in the definition of the offense.

The majority remands this case for resentencing because Braaten's sentence was based, in part, on the erroneous finding that G.J. had been particularly vulnerable. However, the majority affirms Judge Moody's conclusion that Braaten's conduct was among the most serious included in the definition of first-degree sexual assault. Although I agree with the majority's decision to remand the case for resentencing and the court's holding with respect to Judge Moody's finding that G.J. was particularly vulnerable, I disagree with the court's affirmance of the finding that Braaten's conduct was among the most serious contemplated within the definition of the offense. My reasons are as follows.

**1324**

### A. Most Serious Conduct Aggravator.

First-degree sexual assault is an unclassified offense. AS 11.41.410(b). The maximum term is thirty years' incarceration. AS 12.55.125(i). Presumptive terms are respectively: eight years for an unaggravated first offense; ten years for a first offense accompanied by serious physical injury to the victim, possession of a firearm, or use of a dangerous instrument; fifteen years for a second felony conviction; and twenty-five years for a third felony conviction. *Id.* This is Braaten's first felony conviction. G.J. did not suffer serious physical injury and no dangerous instrument was involved. In the absence of aggravating or mitigating factors, therefore, the trial judge was obligated to give Braaten the eight-year presumptive term and could not impose additional time even if it was suspended. *McManners v. State*, 650 P.2d 414, 416 (Alaska App.1982).

The presumptive sentencing system in the revised criminal code reflects the "just deserts" theory of punishment.[1] The Alaska subcommission on criminal law revision explained the "just deserts" theory as follows:

In determining the appropriate sentence to be imposed, two basic principles guide the court:

(1) the least severe measure should always be used which accomplishes the purposes of sentencing; and

(2) primary consideration in imposing sentence should always be given to the seriousness of the offense and the prior criminal history of the convicted person.

Under the "just deserts" theory of punishment, as a matter of justice or fairness, decisions with respect to a particular defendant ought to be made on the basis of what the person has done, not on some speculative expectation of what he might do in the future. Neither rehabilitation nor deterrence, as such, are primary considerations in determining the appropriate sentence, although both remain objectives of a "deserved" sentence. If a person's crime is serious, his punishment should be severe. If the offense is minor, the sanction should be mild.

Alaska Criminal Code Revision Part VI, at 19–20 (Tent. Draft 1978) (hereafter Tent. Draft).

The subcommission was also very concerned about "unjustified disparity in sentences and the attainment of reasonable uniformity in sentences." *See* AS 12.55.-005 (Declaration of purpose). The legislature adopted the subcommission's philosophy and incorporated it into the presumptive sentencing scheme. Under the revised code, disparity in sentencing is to be avoided by use of presumptive sentences that can be varied only under limited circumstances. The code sets out specific procedures to insure that punishment will be based solely upon past criminal convictions and the seriousness of the defendant's conduct. Past convictions are directly addressed. Sentences which increase with the seriousness of the defendants' conduct are addressed in two ways. First, there is a presumptive sentence for those first offenders who commit classified offenses who possess a firearm, use a dangerous instrument, or cause serious physical injury to their victim. AS 12.55.125(c)(2). In all other cases, first offenders who commit classified offenses are not subject to presumptive sentencing. AS 12.55.125(c)(1) (Those who commit unclassified offenses (murder, kidnapping, first-degree misconduct involving a controlled substance, first-degree sexual assault, or first-degree sexual abuse of a minor) are subject to presumptive sentencing. AS 12.55.125(a), (b),

1. The legislature adopted a system of "presumptive sentencing" patterned upon recommendations contained in The Report of the Twentieth Century Fund Task Force on Criminal Sentencing, *Fair and Certain Punishment* (1976) (hereafter *Fair and Certain Punishment*). While the revised code differs in some particulars from the recommendations set out in Alaska Criminal Code Revision Part VI (Tent. Draft 1978) (hereafter Tent. Draft), it clearly adopts the philosophy found in those proposals. That philosophy was intended to reflect to the greatest extent possible the "just deserts" theory of punishment. Tent. Draft at 19, *citing* A. Von Hirsch, *Doing Justice: The Choice of Punishments* (Hill and Wang ed. 1976).

(i).) Second, and most important, the trial court's sentencing discretion is limited to consideration of the specific aggravating and mitigating factors identified by the legislature. Those factors are set out in AS 12.55.155. In large measure they simply duplicate the aggravating and mitigating factors suggested in *Fair and Certain Punishment. See Heathcock v. State,* 670 P.2d 1155, 1159 n.2 (Alaska App.1983).

The Alaska legislature adopted some aggravating and mitigating factors which are not found in *Fair and Certain Punishment.* Among them are AS 12.55.-155(c)(10) and (d)(9), dealing with, respectively, the most serious and least serious conduct within the definition of the offense. The legislature intended these factors to have a limited scope. The legislature explained its reason for adopting these factors as follows:

> Under subsections (c)(10) and (d)(9) a presumptive term may be aggravated or mitigated if the conduct constituting the offense was among the most or least serious conduct included within the definition of the offense. For example, if the defendant was convicted of a felony two years earlier, and is now being sentenced for the theft of $24,999, theft in the second degree, a class C felony, the fact that the conduct constituting the offense was among the most serious conduct included in theft in the second degree may aggravate the presumptive term.

Commentary on the Alaska Revised Criminal Code, Supp. No. 47 at 161, 2 Senate Journal (1978), following p. 1413.[2]

In light of this example, conduct which, in fact, approaches the conduct which would constitute a higher offense is the most serious conduct included in the definition of the offense. Conversely, conduct which approaches conduct constituting a less serious level of the offense would be the least serious within the definition of the offense. Most of our decisions finding conduct to be among the most serious or the least serious can be explained in these terms. *See, e.g., Benboe v. State,* 698 P.2d 1230, 1232 (Alaska App.1985); *Fee v. State,* 656 P.2d 1202, 1204–05 (Alaska App.1982); *Huckaby v. State,* 632 P.2d 975, 976 (Alaska App.1981).

We should limit the scope of the aggravating factor and the mitigating factor to the meaning intended by the legislature. Conduct is among the most serious within the definition of the offense if and only if it approximates conduct which would constitute a higher degree of crime. Conversely, conduct is among the least serious within the definition of the offense if and only if it approximates a lesser-included offense.

Viewing the most serious offense aggravator and the least serious offense mitigator in this way avoids two obvious problems which occur if the two factors are given a broader reading. First, use of these factors, narrowly construed, reduces the possibility of disparate sentencing.[3] If the factors only apply when the defendant's conduct approximates a greater or lesser offense, we avoid the problem of each judge reading back into the statute

**2.** The legislature's comment refers to the fact that theft of $25,000 would constitute theft in the first degree, a class B felony. *See, e.g.,* AS 11.46.120.

**3.** The proponents of specific statutory aggravating and mitigating factors recognized that different judges differ substantially in determining which offenses are aggravated and which mitigated. They observed:

> In an effort to construct a list of aggravating circumstances, we began with a rather inclusive catalogue of factors that are probably considered—by at least some judges—in imposing sentences. Some of these are clearly improper, such as the defendant's race,

appearance, and sex. Others are debatable, such as whether the defendant pleaded guilty or cooperated with the authorities. Our experience suggests that different judges—acting without legislative or appellate court guidance—have different views as to whether a given factor is appropriately considered in sentencing. It is our conclusion that these issues should be openly debated, that in situations where the factors are fairly typical and frequently recurring, the legislature should decide whether they should be considered in sentencing.

*Fair and Certain Punishment* at 42.

his or her idiosyncratic list of aggravating and mitigating factors under the guise of determining which conduct is among the most and least serious within the definition of the offense. Second, by giving the factors a meaning consistent with the legislative history, we distinguish between these factors and the other aggravating and mitigating factors, avoiding the overlap which we noticed in *Juneby v. State*, 641 P.2d 823 (Alaska App.1982) (*Juneby I*) *modified on rehearing*, 665 P.2d 30 (Alaska App.1983) (*Juneby II*).

Braaten's conduct clearly does not verge on some higher degree of offense. The only offenses more serious than first-degree sexual assault are kidnapping and murder. While Braaten restrained G.J.'s freedom, it is clear that he did so only in order to attain his objective of having sexual intercourse with her. Such conduct is expressly excluded from the restraint that will authorize a finding of kidnapping.[4] While Braaten apparently threatened both to stab G.J. or smother her, it is not contended that his conduct rose to the level of attempted murder. In summary, Braaten's conduct cannot be classed with the most serious within the definition of the offense of first-degree sexual assault. Judge Moody's finding of this aggravating factor was therefore clearly erroneous.[5]

**B. Excessiveness.**

The majority holds, and I agree, that the trial court properly found that Braaten's

---

After discussing proposed aggravators, the proponents of presumptive sentencing concluded:

> After considerable debate among members of the Task Force about which of these to recommend, we could only agree on those few listed below. To our minds, this disagreement demonstrates most dramatically the necessity for having open legislative debate about the mitigating and aggravating factors that are appropriately considered by a sentencing judge. There are undoubtedly many that we simply failed to think of and that, had we thought of them, might well have been included in the consensus. Again, however, our list is merely illustrative and suggestive. Our point is that the legislature should—through open debate—decide which among the typical recurring factors should and should not be considered by the sentencing judge.

*Id.* at 43.

4. This is clear from the Commentary and Sectional Analysis for the 1980 Amendments to the Revised Criminal Code:

> It should be noted that this amendment [clarifying that "restraint" of a victim with intent to commit a sexual assault is kidnapping] would not turn a restraint that was merely incidental to a sexual assault into kidnapping. For example, defendant who forces a victim who is jogging along a bike path into the woods a few feet from the bike path in order to commit a sexual assault has not committed kidnapping. The "restraint" of the victim was too closely related to the sexual assault, both in time and the degree of movement, to qualify as a separate crime. However, if the victim was forced into the defendant's car and then driven a block to a nearby deserted house and sexually assaulted, or sexually assaulted while his accomplice was driving the car, kidnapping has occurred. In this situation the restraint was specifically done to facilitate the commission of the felony and there was significant confinement or movement of the victim beyond that necessary to commit the sexual assault. (*See generally Levshakoff v. State*, 565 P.2d 504 (Alaska 1977)*).

Supp. No. 44 at 6 in 2 Senate Journal (1980), following p. 1436.

5. Braaten's conduct may have constituted burglary in the first degree because he assaulted G.J. after she ordered him to leave her apartment. *See, e.g.*, AS 11.46.300; AS 11.46.-350(a)(1). In *Juneby I*, we rejected a finding that Juneby's conduct was among the most serious within the contemplation of the offense. 641 P.2d at 840–44. Juneby's conduct was very similar to Braaten's. We intimated, however, that if Juneby had not been separately charged with burglary, the burglary might have aggravated his offense. *Id.* at 842. Juneby's case is distinguishable from the instant case, however, because Juneby's conduct as described by the court might well have constituted attempted murder. *Id.* at 837.

In a later case, *Hansen v. State*, 657 P.2d 862, (Alaska App.1983), we mentioned in passing that an attempted sexual assault which took place in the night time, in which Hansen used a dangerous weapon, could qualify as the most serious within the contemplation of the offense. *Id.* at 864, *citing Erhart v. State*, 656 P.2d 1199 (Alaska App.1982). Hansen's case must be viewed in context, however. First, as a first felony offender, Hansen was not subject to presumptive sentencing. *Austin v. State*, 627 P.2d 657 (Alaska App.1981). Normally a first felony offender should receive a more favorable sentence than a second felony offender subject to

sentence should be increased because he physically injured G.J., AS 12.55.155(c)(1). However, the majority does not address an issue which I believe to be important on remand, which is the weight the trial court should attach to the "physical injury" aggravator.

It is undisputed that Braaten caused G.J. "physical injury" as defined in AS 11.81.-900(b)(40), the definition incorporated into AS 12.55.155(c)(1). Under AS 11.81.-900(b)(40), "physical injury" means a physical pain or an impairment of physical condition. Physical pain or impairment of physical condition, in turn, is limited to that suffered as a result of physical contact.[6] Thus, if there is physical contact, then any resulting pain or suffering, constitutes physical pain and, by definition, physical injury. One manner of committing sexual assault in the first degree requires "sexual penetration," which is defined to require contact with the victim's body. AS 11.41.-410(a)(1). *See, e.g.,* AS 22.81.900(b)(53). Consequently, any pain, suffering or discomfort which is directly caused by the sexual penetration will satisfy the definition of physical injury.

G.J. was sexually penetrated and did suffer pain and discomfort. Therefore, she suffered physical injury. Although G.J. was also beaten by Braaten, I do not believe that her physical injuries warrant a substantial increase in his sentence.

I reach this conclusion for three reasons. First, as we pointed out in *Juneby I,* physical injuries of the kind suffered by G.J. are fairly typical in connection with sexual assault cases. 641 P.2d at 838–39. While it is true that it is possible to have a sexual assault without having a beating, the typical case does involve some physical violence. Second, viewed purely as physical violence, Braaten's assault on G.J. would constitute at most assault in the fourth degree, a class A misdemeanor with a maximum one-year penalty. *See* AS 11.41.-230(a)(1) (recklessly causing physical injury to another). While physical injury warrants some aggravation of a presumptive sentence, the degree of aggravation should correspond to an appropriate sentence for the physical injury itself. Viewed simply as an assault in the fourth degree and disregarding any concomitant burglary or sexual assault, Braaten's conduct would appear to be a relatively minor fourth degree assault. Finally, and most important, the legislature has specifically provided an enhanced presumptive sentence of ten years for one convicted of sexual assault in the first degree, who causes his victim "serious physical injury." AS 12.55.125(i)(2). (if the sexual assault is a first felony conviction, and the defendant possessed a firearm, used a dangerous instrument, or caused serious physical injury during the commission of the offense, presumptive term is ten years). It would be anomalous if the legislature established a ten-year maximum sentence for a sexual assault in which the victim suffered serious physical injuries but permitted mere physical injury, used as an aggravating factor, to justify a sentence in excess of ten years.

While this provision would seem to set a ten-year ceiling as an appropriate sentence

---

presumptive sentencing. However, Hansen's long record of misdemeanor offenses, consisting of approximately thirty-two convictions in nine years, justified deviating from *Austin* and imposing a sentence increased on the basis of the most serious conduct aggravator. Hanson broke into M.L.'s house at night and assaulted her while she was sleeping in her bed. We concluded:

> If we look at the burglary as being an aggravating factor in the sexual assault, along with the other aggravating factors in this crime, we do not see sufficient reasons to give Hansen a total sentence exceeding the maximum ten-year sentence for this crime.

*Hansen,* 657 P.2d at 864.

**6.** When we trace out the derivation of these terms, it is clear that the legislature wished to limit the definition of physical injury to any pain or suffering resulting from physical impact. *See, e.g.,* the definition of "force" in AS 11.81.900(b)(22). ("force" means any bodily impact, restraint, or confinement or the threat of imminent bodily impact, restraint or confinement; "force" includes deadly and nondeadly force.) Thus the legislature has apparently distinguished between "physical pain" and "mental pain" by requiring some impact or contact with the victim's body.

for Braaten, we cannot overlook the fact that all of the time Braaten received in excess of the eight-year presumptive sentence was suspended. *See, e.g., Tazruk v. State,* 655 P.2d 788 (Alaska App.1982) (in applying the *Austin* rule, we look primarily to time actually imposed and give lesser consideration to suspended time). Under these circumstances, a four-year suspended sentence, in addition to the eight-year presumptive sentence, would not be clearly mistaken.

I therefore join in the decision of the majority to REMAND for the purpose of resentencing.