Andy N. RITTER, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8386.

Court of Appeals of Alaska.

Aug. 20, 2004.

Quinlan Steiner, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for the Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Andy N. Ritter, a massage therapist working in Barrow, was convicted of second-degree sexual assault for engaging in sexual contact with four female clients.[1] Ritter appeals his convictions, arguing that the State failed to present sufficient evidence that the sexual contact occurred "without [the clients'] consent" as that phrase is defined in AS 11.41.470(8). Ritter also challenges various aspects of the superior court's sentencing decision.

For the reasons explained here, we conclude that the evidence was sufficient to support Ritter's convictions (except for one alternate count). However, a legal error was committed at Ritter's sentencing, so he must be resentenced.

### Underlying procedural facts

Ritter was initially charged with second-degree sexual assault for inappropriately touching three of his clients: N.W., L.S., and M.R. After Ritter was indicted and released on bail, he assaulted a fourth client, L.F. (Another woman, A.M., may have been assaulted in a similar manner, but she did not wish to press charges.)

With respect to each victim, the State charged Ritter under two alternate subsections of AS 11.41.420(a). The State alleged that Ritter engaged in sexual contact with the women without their consent (subsection (a)(1)), and also that Ritter engaged in sexual contact with the women under the guise of providing professional health care, knowing that the women were unaware that a sexual act was being committed (subsection (a)(4)).

Following Ritter's initial indictment (the one charging him with assaulting the first three women), Ritter and the State entered into a plea bargain. Under this plea bargain, Ritter pleaded no contest to a single count of second-degree sexual assault, and he received a sentence of 6 years' imprisonment with 3 years suspended. But after he was sentenced, Ritter successfully challenged his plea. The plea bargain was set aside, and all of the original charges were reinstated. In addition, the State now indicted Ritter for the sexual assault of the fourth woman (the assault he committed while he was on bail release).

Ritter went to trial, and he was convicted of sexually assaulting each of the four victims. The jury found him guilty under the "without consent" theory with respect to all

---

1. AS 11.41.420(a)(1) & (a)(4). The definition of "sexual contact" is codified in AS 11.81.900(b)(57).

four victims, and the jury found him guilty under the "guise of health care" theory with respect to victims N.W. and M.R.

Ritter received a composite sentence of 10 years' imprisonment with 5 years suspended.

*The sufficiency of the evidence to support the four "without consent" verdicts*

When an appellate court assesses the sufficiency of the evidence to support a criminal conviction, the court views the evidence (and the inferences that could reasonably be drawn from that evidence) in the light most favorable to supporting the verdict.[2] We therefore discuss the State's evidence against Ritter in that light.

### (a) Evidence pertinent to the charge involving N.W.

N.W. went to Ritter for massage therapy because she was experiencing neck and back pain. She had four appointments with Ritter. The first three occurred without incident. On the day of her fourth appointment, the weather was cold in Barrow, with temperatures below zero. At this fourth appointment, while Ritter was massaging N.W.'s neck and back, she felt Ritter's erect penis pressing against the top of her head. N.W. testified that she was "in shock" and that she felt "panicky". She stated that she did not get up and leave the room because she thought that she would not win any physical confrontation with Ritter, because she was naked and her clothes were on the other side of the room, and because it was so cold that running outside naked was not a viable option.

Later in the massage, Ritter removed the sheet that was covering the upper half of N.W.'s body. Again, N.W. felt panicky and scared. Ritter began massaging N.W.'s breasts, including her nipples, and N.W. again felt Ritter's erection against her head. N.W. testified that Ritter's touching of her breasts did not feel like a therapeutic massage, but rather like a massage one would get from a husband or lover.

Ritter then climbed onto the table and straddled N.W. He continued to massage her breasts, and N.W. felt Ritter's erection pressing against her stomach. N.W. testified that she did not want Ritter to massage her breasts, but she "froze"; she "figured it [would] be over soon", and she intended to "get out ... just as quick as [she could] afterwards".

Ritter then got off the table and began to massage N.W.'s stomach. During this portion of the massage, Ritter took N.W.'s hand and held it against his penis for a couple of seconds.

When the massage was over, and after N.W. got dressed, Ritter asked her if she wanted a hug. N.W. told Ritter that this would be "inappropriate", and she left. Later, N.W. went to the police. Based on N.W.'s account of Ritter's behavior during the massage, the police obtained a *Glass* warrant to record a telephone conversation between N.W. and Ritter.[3] During this conversation, N.W. confronted Ritter about his behavior, and he did not deny it.

### (b) Evidence pertinent to the charge involving M.R.

M.R. went to Ritter for a massage because she was experiencing stress. During the massage, M.R. felt uncomfortable with the positioning of the sheets covering her body, because her torso was left exposed. During the session, Ritter massaged M.R.'s breasts and he touched her nipples. Although M.R. thought that this touching was "strange", she initially assumed that it was part of the massage therapy. However, after a time, M.R. began to think that Ritter's conduct was something other than massage therapy, and she became afraid.

While Ritter was standing at her head and leaning over her, M.R. felt his erect penis being pressed against her head. M.R. testified that she felt "uncomfortable", but she was afraid to try to leave because she was alone in the room with Ritter, because it was

---

2. *See, e.g., Shafer v. State,* 456 P.2d 466, 469 (Alaska 1969); *Tipikin v. Anchorage,* 65 P.3d 899, 901 (Alaska App.2003).

3. *See State v. Glass,* 583 P.2d 872 (Alaska 1978).

cold outside, and because the stairs outside were steep and icy.

### (c) Evidence pertinent to the charge involving L.S.

L.S. went to Ritter for massage therapy because of a back injury. Her first massage with Ritter did not help her condition; indeed, the massage caused her severe pain. Nevertheless, following her doctor's advice, L.S. scheduled another massage with Ritter (after telling him about her dissatisfaction with the first massage).

During this second massage, while L.S. was lying on her stomach, Ritter brushed her leg with his erect penis several times. L.S. testified that she was in "shock" at this occurrence. Later, while L.S. was lying on her back and Ritter was massaging her inner thigh, Ritter repeatedly brushed his hand against her genitals. The first time that this occurred, L.S. assumed that the touching was accidental. When the touching occurred again, she suspected that it was intentional, but she did not protest because she "just want[ed] to get through this". L.S. testified that she did not take more aggressive action to end the massage because she was undressed, and because she was in shock and in fear, not knowing "how far [Ritter] would go". Later, while Ritter was massaging L.S.'s head, he pressed his erect penis against her head.

L.S. testified that she did not consent to any of this sexual touching. Moreover, she testified that Ritter knew that she was uncomfortable with the touching. L.S. described how, when Ritter touched her inappropriately, she would "tighten up", and Ritter would then get "defensive" and tell her not to be "inhibited".

### (d) Evidence pertinent to the charge involving L.F.

L.F. went to Ritter for massage therapy because of chronic hip pain. She scheduled an appointment in November 1997, after Ritter had been charged with sexually assaulting N.W., M.R., and L.S. L.F. knew about the pending criminal charges, but she decided to give Ritter "the benefit of the doubt" because he had never behaved inappropriately with her during any of her previous massages.

When L.F. arrived for the massage, Ritter showed her a newspaper article about the pending charges, and then he asked her to sign a form stating that she knew about the charges and still consented to the massage.

The massage lasted an hour, and nothing amiss occurred. But then L.F. asked for an additional hour of massage, because she did not think that Ritter would be back in the area soon. During the second hour, Ritter moved his hand to L.F.'s groin and left his hand there. L.F. testified that she initially felt confused, then afraid and vulnerable. Rather than confront Ritter directly, she asked him to begin massaging her shoulders.

Ritter then began talking about the pending criminal charges. He told L.F. that he was being charged for touching a woman's nipples, and then he brushed his hand across L.F.'s nipples. L.F. could also feel Ritter's erect penis pressed against her arm. L.F. was now "in shock"; she felt "violated" and "vulnerable". L.F. did not try to get up and run away because she was wearing only a sheet, and because she was unsure where she could go.

### (e) The legal definition of "without consent"

It is clear from the above-described testimony that Ritter's sexual contact with the four women occurred "without their consent", as these words are used in everyday speech. But our criminal code employs a specialized definition of "without consent". For purposes of Alaska's sexual assault statutes, sexual penetration or sexual contact occurs "without consent" if the person (1) "is coerced by the use of force against [any] person ... or by the express or implied threat of death, imminent physical injury, or kidnapping to be inflicted on anyone", or if the person (2) "is incapacitated as a result of an act of the defendant".[4]

---

4. AS 11.41.470(8).

■ In Ritter's case, the State relied on the first part of this definition. The State's theory of prosecution was that Ritter's conduct, coupled with the circumstances of the massages, amounted to coercion because it constituted an implicit threat of force if the women did not submit to the sexual touching. Ritter contends that there was no evidence that he ever threatened the women, either expressly or implicitly.

> *(f) Why we conclude that the evidence was sufficient to establish that the sexual contact occurred "without consent"*

Two prior decisions of this Court provide the reference points for our analysis of this question: *Nicholson v. State*, 656 P.2d 1209 (Alaska App.1982), and *Brower v. State*, 728 P.2d 645 (Alaska App.1986).

In *Nicholson*, a teenage girl woke up one night to find the defendant in bed with her, fondling her breasts. The girl hesitated, then jumped out of bed; she fled downstairs, armed herself with a butcher knife, and telephoned a neighbor for help.[5]

The girl later testified that she hesitated because she was temporarily in shock, and because she feared that the defendant might hurt her.[6] We held that, viewed in the light most favorable to upholding the verdict, this was sufficient evidence of coercion to make the sexual contact "without consent" under the definition contained in our criminal code:

> Nicholson ... argues ... that he did not "coerce [the girl] to engage in sexual contact." We disagree. The evidence supports a finding that Nicholson could reasonably foresee that [the girl] would be momentarily stunned by fear caused by Nicholson's unexpected and uninvited entry into her bed, in the early morning hours, enabling him to continue to caress her after she awoke. [The girl] testified [that] she was temporarily in shock, and that she was afraid [that] he would hurt her. Under these circumstances, we believe that a jury could find that [the girl's] momentary acquiescence in Nicholson's fondling her breast was "coerced by an

implicit threat of imminent physical injury" and thus constituted second-degree sexual assault.

*Nicholson*, 656 P.2d at 1213.

In *Brower*, on the other hand, the victim of the allegedly unconsented-to sexual activity was a sixteen-year-old boy who lived with the defendant. Viewing the evidence in the light most favorable to the State, Brower made sexual advances to the boy and attempted to engage in sexual contact with him.[7] However, the State conceded—and we agreed—that the evidence was insufficient to establish that Brower had acted "recklessly" with respect to the possibility that the boy did not consent to his advances. We declared that

> *Nicholson* [was] readily distinguishable. Given the close relationship between Brower and [the boy], Brower's actions cannot be found to have been in reckless disregard of [the boy's] lack of consent.

*Brower*, 728 P.2d at 647.

The situation in Ritter's case appears to fall in between the facts of *Nicholson* and the facts of *Brower*. This is not a case like *Nicholson*, where the victim and the defendant were strangers to each other. The victims in this case were Ritter's patients; each of them had come to Ritter for massage therapy on several occasions. In addition, the women knew that the massage therapy would involve being alone with Ritter, undressed, and that Ritter would touch their bodies.

However, Ritter's case is like *Nicholson* in one crucial aspect: Ritter could have reasonably foreseen that the women would be surprised and alarmed by his actions. All of the victims testified that they had never experienced anything like Ritter's sexual touching in other massages, and they all testified that this touching left them in shock or afraid. In addition, like the defendant in *Nicholson*, Ritter could reasonably have foreseen that the circumstances of the massage therapy would make his victims afraid to protest or resist: they were alone with him, they were undressed, and it was not feasible to run

---

5.  *Nicholson*, 656 P.2d at 1210.

6.  *Id.* at 1213.

7.  *Brower*, 728 P.2d at 646.

outside into the cold. All of the women testified that these circumstances made them decide to endure the touching.

For these reasons, we conclude that the evidence presented at Ritter's trial reasonably supports a finding that the women were coerced by an implicit threat of imminent physical injury or kidnapping—which, in this context, means restraining another person with intent to sexually assault them. *See* AS 11.41.300(a)(1)(C). Thus, the evidence is sufficient to support the jury's decision that the sexual contact was "without consent".

In a related argument, Ritter contends that even if the sexual contact took place, without consent, there was insufficient evidence that he recklessly disregarded his victims' lack of consent. Ritter points out that none of the women verbalized their lack of consent to the touching. This is apparently true—although we note that, according to L.S.'s testimony, Ritter was aware that L.S. was uncomfortable with the touching, and he chided her for being "inhibited".

But be this as it may, the question is not whether Ritter's victims protested or physically resisted, but rather whether Ritter was aware of, and consciously disregarded, a substantial and unjustifiable possibility that his sexual contact with the women was being conducted without their consent.[8] Based on the evidence we have already described, a jury could reasonably conclude that Ritter acted at least recklessly with regard to this possibility.

*The sufficiency of the evidence to support the "guise of health care" verdict on the charge involving N.W.*

■ As explained above, Ritter was also convicted of two alternate counts of second-degree sexual assault on the theory that he engaged in sexual contact under the guise of health care, a violation of AS 11.41.420(a)(4). Ritter challenges one of these verdicts—the one involving N.W.

Under the "guise of health care" theory, the State was obliged to prove that Ritter engaged in sexual contact with N.W. during the course of his professional treatment of her, and that Ritter knew that N.W. was unaware that a sexual act was being committed on her.

N.W. was conscious during the entire massage session. From N.W.'s testimony, it is obvious that she was aware when Ritter touched her breasts, when Ritter pressed his penis against her head, and when Ritter held her hand against his penis. But this does not resolve the issue of whether N.W. was "aware" or "unaware" that Ritter was engaging in sexual activity with her.

We have interpreted AS 11.41.420(a)(4) to apply to "two distinct situations: (1) instances where a patient is unconscious or otherwise fails to perceive that they are being touched on the genitals, anus, or female breast; and (2) instances where a patient mistakenly believes that this touching is part of legitimate treatment."[9] Thus, the State could conceivably prove its "guise of health care" charge even though N.W. was aware of the sexual touching—if the State proved that N.W. mistakenly believed that the touching was a legitimate part of the massage therapy, and that Ritter knew that N.W. was laboring under this misapprehension.

But N.W. testified that Ritter's touching of her breasts did not feel like a therapeutic massage. She further testified that it did not "cross [her] mind" that there might be a legitimate purpose for this touching. (Afterwards, N.W. apparently did research to find out whether there could be a legitimate purpose for Ritter's actions. But there is no evidence that she misunderstood or doubted the nature of the touching during the massage session.)

We further note that, during the State's closing argument to the jury, the prosecutor never argued that N.W. mistakenly thought that there was a legitimate reason for Ritter's actions. In fact, the prosecutor contrasted N.W. to two of the other victims who, apparently, had thought (at least initially) that the sexual contact might be a proper part of the professional treatment.

---

8.  *See* AS 11.81.900(a)(3) (the definition of "recklessly").

9.  *Ritter v. State,* 16 P.3d 191, 198 (Alaska App. 2001).

In short, we conclude that the "guise of health care" verdict involving N.W. is not supported by sufficient evidence. Ritter is entitled to a judgement of acquittal on this alternate count.

*Ritter's claim that his right to due process of law was violated when the superior court sentenced him to a greater term of imprisonment than the one he initially received when he pleaded no contest to a single count of sexual assault*

■ As described earlier, Ritter and the State initially agreed to resolve Ritter's case short of trial, by having Ritter plead no contest to a single count of second-degree sexual assault. Ritter actually entered this plea, and he received a sentence of 6 years' imprisonment with 3 years suspended. But, later, Ritter was successful in withdrawing his plea and having this conviction set aside.

At that point, all of the original charges were reinstated. Moreover, the State now indicted Ritter for his assault of the fourth victim, the assault he committed while he was released on bail. Following a jury trial, Ritter was convicted of four counts of second-degree sexual assault, one for each of his victims.

(With respect to two of these victims, the jury actually found Ritter guilty of two counts—each count representing an alternate theory of how Ritter's conduct constituted second-degree sexual assault. These alternate counts were merged for purposes of judgement and sentencing. Thus, even though the jury returned guilty verdicts on six counts, Ritter was convicted of, and sentenced on, only four counts.)

For these four counts of second-degree sexual assault, Superior Court Judge Michael I. Jeffery sentenced Ritter to a composite term of 10 years' imprisonment with 5 years suspended. On appeal, Ritter claims that it was illegal for Judge Jeffery to sentence him to a term of imprisonment greater than the term of imprisonment Ritter initially received under the now-rescinded plea bargain.

Ritter points out that, even though he was originally sentenced on only one count of second-degree sexual assault, Judge Jeffery knew about Ritter's assaults on all four women at the time of that original sentencing, and the judge took those assaults into account when he fashioned Ritter's sentence on that one count. For this reason, Ritter contends that it was improper for Judge Jeffery to increase Ritter's sentence following the trial, even though Ritter was then being sentenced for four counts of sexual assault instead of one.

Ritter relies on this Court's decision in *Morgan v. State*, 673 P.2d 897 (Alaska App. 1983). In *Morgan*, the defendant was charged with four crimes—rape, assault with a dangerous weapon, assault with intent to commit rape, and assault and battery. Just before trial, Morgan offered guilty pleas to three of these charges—all of them except the rape charge. Based on Morgan's pleas, the State dropped the rape charge to spare the victim the ordeal of trial. Morgan was then sentenced for the three lesser crimes. But on appeal to the Alaska Supreme Court, Morgan successfully argued that he should be allowed to withdraw his pleas. The case went back to the superior court, Morgan went to trial on all four charges, and he was convicted. This time, Morgan received a greater sentence than the one he had originally received when he pleaded guilty to the three lesser charges.[10]

In his second appeal (his appeal to this Court), Morgan argued that the due process and double jeopardy clauses of the constitution protected him against an increased sentence. One aspect of Morgan's argument was based on the fact that the sentencing judge had mentioned the rape when he originally sentenced Morgan for the three lesser crimes:

> Morgan [argues] that a sentence in excess of [his original sentence] was not justified because Judge Cooke took Morgan's rape into account in sentencing Morgan on his pleas of guilty to the [three lesser] charges.... This argument is unpersuasive. In sentencing Morgan for those three charges, Judge Cooke did indicate that he would take into account all relevant

---

10. *Morgan*, 673 P.2d at 899.

circumstances, including the injuries suffered by [the victim]. However, Judge Cooke made it clear that he did not intend to make any finding as to whether Morgan actually committed the offense of rape and that he did not intend to sentence Morgan for any crimes other than those to which he had pled guilty.

*Morgan*, 673 P.2d at 903 n. 8.

Ritter interprets this footnote to mean that it would have been constitutionally improper for Morgan to receive a greater sentence the second time around if the sentencing judge *had* considered all four charges when he imposed Morgan's original sentence. And Ritter argues that this same rule should apply to his case as well.

We do not read the *Morgan* footnote this way. Rather, the footnote indicates that the *Morgan* court did not reach the issue that Ritter poses. It was unnecessary to reach this issue because Morgan's sentencing judge expressly declared that he was making no finding as to whether Morgan had committed the fourth crime (the rape).

Ritter's case does, however, pose the problem that the *Morgan* court did not have to resolve. At Ritter's original sentencing—when Ritter, pursuant to the plea bargain, was being sentenced for a single count of second-degree sexual assault—Judge Jeffery was not only aware of Ritter's assaults on all three victims mentioned in the original indictment, but the judge was also aware of Ritter's assault on a fourth victim while he was free on bail. Judge Jeffery took all of these assaults into account when he assessed Ritter's degree of dangerousness and prospects for rehabilitation.

Ritter argues that because Judge Jeffery's original sentencing decision was influenced by the fact that Ritter had assaulted all four victims, Ritter thereby acquired a constitutional protection against any greater sentence for any of this conduct. That is, Ritter claims that even though his original sentence was for a single negotiated count of sexual assault, the court was thereafter barred from sentencing Ritter to a greater composite sentence for any offenses based on the same

underlying conduct, even after Ritter repudiated the plea bargain, went to trial, and was convicted of multiple counts of sexual assault.

Ritter's proposition, in its broadest reading, is that a criminal defendant becomes constitutionally insulated from any later conviction or sentence for criminal conduct if that conduct has previously been considered by a court in fashioning the defendant's sentence for another crime. This argument has been rejected by the United States Supreme Court. In *Witte v. United States*, 515 U.S. 389, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995), the Court held that the double jeopardy clause does not bar a defendant's conviction and sentence for criminal conduct that was earlier considered by another court when the defendant was sentenced for another crime. See the Ninth Circuit's decision in *Salemo v. United States*, 81 F.3d 1453, 1461–62 (9th Cir.1996), where the court applied the *Witte* decision to a case whose facts are similar to the facts of Ritter's case.

We need not decide whether to endorse the *Witte* rule as a matter of Alaska constitutional law because Ritter's case actually presents a narrower issue. The issue is narrower because this appeal arises out of Ritter's repudiation of a plea bargain.

Ritter was originally indicted for sexually assaulting three women. He agreed to plead no contest to a single count of sexual assault, with the understanding that the other charges would be dismissed. Ritter entered his plea and was sentenced on the single count. Then he repudiated his plea and chose to go to trial on all of the counts in the indictment (supplemented by a new indictment charging him with sexually assaulting a fourth victim).

Under these circumstances, Ritter is not entitled "to reject [his] plea bargain and then erect the shield of double jeopardy to the revived counts".[11] "[I]t is well-settled that [the guarantee against] double jeopardy does not apply to the original counts [of] an indictment when a defendant has withdrawn or successfully challenged his plea of guilty to

**11.** *Fransaw v. Lynaugh,* 810 F.2d 518, 526 (5th      Cir.1987).

lesser charges."[12] This rule applies even after the defendant has been sentenced on the lesser charges.[13]

For these reasons, we conclude that when Ritter was sentenced for the multiple counts of sexual assault following his trial, his term of imprisonment was not limited to the sentence he originally received for one count of sexual assault under the now-repudiated plea bargain.

*Ritter's contention that he should not have received a sentence greater than the 4–year presumptive term that applies to a second felony offender convicted of a single count of second-degree sexual assault*

■ Ritter was a first felony offender, and his offense—second-degree sexual assault—is a class B felony.[14] There is no presumptive term of imprisonment for first felony offenders convicted of this crime, but the legislature has set a 4–year presumptive term for second felony offenders.[15]

Ritter, who was convicted of four counts of second-degree sexual assault, received a composite term of 10 years with 5 years suspended. Citing our decision in *Austin v. State*, 627 P.2d 657 (Alaska App.1981), Ritter argues that this sentence is excessive—that it should not have exceeded the 4–year presumptive term for second felony offenders.

In *Austin*, we held that first felony offenders should ordinarily receive a more favorable sentence than the presumptive term of imprisonment established for second felony offenders convicted of the same crime—and that this ceiling could be exceeded only if the State proved aggravating factors under AS 12.55.155(c) or extraordinary circumstances under AS 12.55.165. But in *Farmer v. State*, 746 P.2d 1300 (Alaska App.1987), we clarified that the rule is different when a defendant is being sentenced for two or more counts. In those circumstances, although the presumptive term for a second felony offender remains "an important benchmark", a first felony offender can be sentenced to a greater term of imprisonment for any good reason.[16]

Here, Ritter's four counts of sexual assault involved four different victims and four different occasions. Moreover, one of these assaults occurred after Ritter had already been indicted for his earlier crimes and was free on bail. Given all of this, Judge Jeffery had good reason for exceeding the 4–year ceiling that would apply to any single count of second-degree sexual assault.

*The superior court erred in finding that Ritter's conduct was aggravated under AS 12.55.155(c)(21) because of his repeated sexual assaults*

■ At Ritter's sentencing, Judge Jeffery found that the State had proved that Ritter's conduct was aggravated under AS 12.55.155(c)(21), which applies when a defendant has a history of "repeated instances of [criminal] conduct . . . similar in nature to the offense for which the defendant is being sentenced". In finding aggravator (c)(21), Judge Jeffery relied on the fact that Ritter had sexually assaulted four women. The judge also stated that he thought Ritter had sexually assaulted A.M., the fifth woman who did not wish to press charges.

To the extent that Judge Jeffery relied on Ritter's assaults on the four women named in the indictment, he committed error. In *Juneby v. State*, 641 P.2d 823 (Alaska App. 1982), we held that a sentencing court should not find an aggravating factor based on conduct for which the defendant is being separately sentenced:

> A . . . problem [arises from the fact that the sentencing court found] that Juneby's conduct was among the most serious included in the definition of the offense [based] on the fact that Juneby's rape was committed in [the victim's] home. The [sentencing] judge placed considerable weight on the fact that Juneby had invaded

---

**12.** *United States v. Podde*, 105 F.3d 813, 817 (2nd Cir.1997).

**13.** *Ricketts v. Adamson*, 483 U.S. 1, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987); *People v. Mulcahey*, 155 Ill.2d 549, 187 Ill.Dec. 455, 617 N.E.2d 1176, 1178–1181 (1993).

**14.** AS 11.41.420(b).

**15.** *See* AS 12.55.125(d)(1).

**16.** *Farmer*, 746 P.2d at 1301–02.

the sanctity of his victim's home to commit his crime. Had Juneby been charged only with the crime of sexual assault in the first degree, his decision to commit the sexual assault within the privacy of his victim's home might properly be considered a significant factor bearing on the seriousness of the conduct included in the sexual assault. However, in this case, it is essential to recognize that Juneby was separately charged with and convicted of burglary in the first degree for unlawfully remaining in [the victim's] home with the intent to commit the sexual assault; the court imposed a separate sentence for the burglary. Juneby had thus been separately punished for his act of violating [the victim's] privacy by entering her home.

The judge's finding that Juneby's sexual assault was the most serious within the definition of the offense, because it was based in significant part on consideration of conduct for which Juneby had been separately convicted and sentenced, amounted to punishing Juneby twice for the same conduct: first, by imposing the sentence for burglary; second, by aggravating his presumptive term for sexual assault.

*Juneby,* 641 P.2d at 842.

After the State sought rehearing of this point, this Court re-affirmed its holding that a presumptive term should not be aggravated based on another offense for which the defendant was separately convicted:

The state [suggests] that our original decision should be altered insofar as it prohibits consideration as an aggravating factor of conduct by the defendant for which a separate conviction has been entered and a separate sentence imposed. In reaching our decision, we applied by analogy the policy underlying AS 12.55.155(e), which prohibits consideration of conduct as an aggravating factor if the conduct is an essential element of the offense for which the accused was convicted. The state argues on rehearing that the policy underlying AS 12.55.155(e) is inapplicable as to elements of another offense for which a conviction has separately been entered. However, the state's argument is based almost entirely on the fact that Juneby's sentence for burglary and his sentence for sexual assault were imposed concurrently. In our view, this argument simply disregards the fact that, even though it was concurrent, Juneby's sentence for burglary constituted a separate and distinct punishment from his sentence for sexual assault. Moreover, the state's argument on rehearing presupposes that, in cases involving multiple offenses, concurrent sentencing will be the rule; this assumption is factually unsupported, especially in light of recent legislative amendments. *See* AS 12.55.025(e) and (g).

Furthermore, the position advocated by the state would apparently allow consideration of an aggravating factor involving conduct upon which a separate conviction was based even when the separate conviction resulted in a consecutive sentence. Under such circumstances, the results would be anomalous. In a case where double jeopardy did not prohibit separate convictions and sentences for multiple offenses, each of two convictions entered against the defendant could be deemed aggravated in light of the other conviction, and, in addition, the two sentences could be consecutively imposed. We think a rule permitting such a result would be intolerable, especially in light of the legislature's goal, in adopting presumptive sentencing, of achieving uniformity and eliminating unjustified disparity in sentencing.

*Juneby v. State (on rehearing ),* 665 P.2d 30, 38 (Alaska App.1983).

Ritter was separately convicted and sentenced for his sexual assaults upon the four women mentioned in the indictment. It was therefore improper for the superior court to rely on these four sexual assaults when determining whether aggravator (c)(21) was proved.

This leaves Ritter's assault on A.M., the woman who did not wish to press charges. While Judge Jeffery could justifiably rely on this assault, it does not constitute "repeated" conduct. We therefore reverse the superior court's finding with regard to aggravator (c)(21).

*The superior court could properly conclude that Ritter's conduct was aggravated under AS 12.55.155(c)(5) because his victims were particularly vulnerable*

■ Judge Jeffery also found that Ritter's conduct was aggravated under AS 12.55.155(c)(5), which applies to cases in which "the defendant knew or reasonably should have known that the victim of the offense was particularly vulnerable or incapable of resistance". Relying on our decision in *Braaten v. State*, 705 P.2d 1311 (Alaska App. 1985), Ritter challenges this aggravating factor.

In *Braaten*, the sentencing judge found that the victim of a sexual assault was "particularly vulnerable" because the assault occurred in the victim's apartment, and because the judge concluded that people could reasonably expect heightened privacy and security in their dwelling places.[17] This Court reversed the sentencing judge, holding that aggravator (c)(5) could not be proved "based solely on environmental factors such as the one presented [in Braaten's case]".[18] We held instead that aggravator (c)(5) "requires a finding that the victim was 'substantially incapable of exercising normal physical or mental powers of resistance' . . . ."[19]

In retrospect, this Court might have chosen a better phrase than "environmental factor" to describe the problem in *Braaten*. The rationale of our decision in *Braaten* was that, even though a person might be entitled to a heightened expectation of privacy and security in their dwelling place, the fact that a crime occurs in a dwelling does not really speak to whether the victim was particularly vulnerable. But our choice of words engendered litigation—because "environmental" suggested that no factor other than the victim's long-term physical condition could constitute a proper basis for aggravator (c)(5).

So, in *Wassillie v. State*, 911 P.2d 1071 (Alaska App.1996), and *Williams v. State*, 859 P.2d 720 (Alaska App.1993), we clarified that aggravator (c)(5) could be based on "vul-nerabilities [other than those] arising from a victim's long-term physical condition"—and that the "environmental factors" mentioned in *Braaten* were those factors "external to the victim, as distinguished from those that bear an intrinsic relationship to the defendant's assault and to [the] victim's response to that assault."[20]

One might argue that the *Wassillie–Williams* formulation of the test did not clarify things as much as it might have. But the facts of *Wassillie* and *Williams* are instructive. In *Wassillie*, we upheld a finding of aggravator (c)(5) based on the fact that the victim was asleep when the assault commenced. And in *Williams*, we upheld a finding of aggravator (c)(5) based on the fact that the defendant, who was the victim's stepfather, had engaged in "a long history of sexual and physical abuse that began when [the victim] was a young child", a "prolonged pattern of abuse [that] rendered [the] victim incapable of exercising the type of resistance that could be expected from a typical nineteen-year-old."[21]

We conclude that the facts of Ritter's case are analogous. His victims came to him for massage therapy. In preparation for this therapy, the victims entered a confined space with Ritter and disrobed; they were alone with Ritter so that he might have physical access to their bodies. The victims expected Ritter to touch them, and this created an ambiguity that hindered their mental and physical readiness to resist when that touching began to exceed the bounds of professional massage.

It is true that Ritter betrayed his patients' trust, but Judge Jeffery did not commit the error we found in *Braaten*: he did not find aggravator (c)(5) based on the fact that the victims had a right to trust Ritter, or that they had a right to expect that Ritter would honor their bodily integrity. Rather, Judge Jeffery found aggravator (c)(5) because, given the nature of the victims' therapist-patient

17. *Braaten*, 705 P.2d at 1321.

18. *Id.* at 1322.

19. *Id.*, quoting AS 12.55.155(c)(5).

20. *Wassillie*, 911 P.2d at 1073, quoting *Williams*, 859 P.2d at 722.

21. *Williams*, 859 P.2d at 722.

relationship with Ritter, and given the circumstances of how the massages were administered, Ritter's victims were not capable of exercising normal powers of resistance. There was no error.

*Conclusion*

We affirm Ritter's convictions, with the exception of the alternate "guise of health care" count involving N.W.

We reject all of Ritter's challenges to his sentence, with one exception: we conclude that the superior court erred in finding aggravator (c)(21). The superior court must reconsider Ritter's sentence without this aggravator.