**Moses MILLIGAN, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–10788.**

Court of Appeals of Alaska.

Sept. 21, 2012.

Rex Lamont Butler, Rex Lamont Butler & Associates, Inc., Anchorage, for the Appellant.

Tamara de Lucia, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and John J. Burns, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

### OPINION

BOLGER, Judge.

N.P. was drinking at a bar with a group of people, including Moses Milligan. After the bar closed, N.P. invited the group to continue drinking at her house. N.P. testified that she woke the next morning to find Milligan on top of her, engaging in sexual penetration. Milligan was convicted of sexual assault in the first and second degrees.

At trial, Milligan claimed that N.P. experienced memory loss and did not remember consenting to sexual intercourse. He attempted to introduce evidence that N.P. experienced other alcohol-related memory losses near the time of this incident, but the trial judge excluded this evidence. We conclude that the evidence that N.P. had recently suffered alcohol-related memory loss was admissible to impeach her memory and perception. We therefore reverse Milligan's convictions for sexual assault and remand for a new trial.

Milligan also argues that his indictment should be dismissed because there was insufficient evidence supporting the charge of first-degree sexual assault, and because the prosecutor failed to present exculpatory evidence relating to this charge. We conclude that there was sufficient evidence to support this charge and that the evidence in question was merely an inconsistency that was not clearly exculpatory.

Milligan also argues that, during the grand jury presentation, a police officer mischarac-

terized Milligan's statements to other officers. We conclude that the superior court must reexamine this issue on remand to determine whether the officer's testimony included a "negligent omission" and, if so, whether this omission caused substantial prejudice to the defendant.

### Background

N.P. testified that she worked as a nurse at Quyanna Care in Nome. One evening, N.P. left work at approximately 11:30 p.m. with a co-worker, Melissa Hart, and decided to go to the Polaris Bar. N.P. and Melissa were joined by Buford Sallafie, Gary Evans, and Moses Milligan. N.P. was familiar with Milligan because he was the boyfriend of a traveling nurse who worked at Quyanna Care. At closing time, N.P. invited the group to walk to her apartment for more drinks.

After the group arrived at the apartment, they played music, drank vodka, and smoked marijuana. After they ran out of vodka, N.P. drove Evans to the store to buy two more bottles of liquor. N.P.'s roommate, Jonel Fergerson, also began drinking with them.

The group drank and danced until approximately 5:00 a.m. Fergerson and Milligan began kissing and then retired to Fergerson's bedroom. Around 8:00 a.m., N.P., Hart, and Evans went to breakfast at the Polar Café. After breakfast, N.P. drove Hart and Evans to their homes and returned to her apartment.

When N.P. returned to her apartment, she noticed that Fergerson's door was closed. N.P. went into her bedroom and removed her pants, but left on her shirt, bra, and underwear. N.P. got into bed at approximately 9:30 a.m. and fell asleep promptly.

About forty-five minutes later, N.P. woke to find Milligan on top of her with his penis inside her vagina. N.P. was in shock and did not know what to do. Milligan did not appear to be paying attention to N.P., and N.P. believed Milligan looked as if "he didn't think that [she] was going to wake up."

N.P. demanded to know what Milligan was doing. When Milligan replied that N.P. wanted him there, she said, "[N]o, I didn't and you took my panties off." N.P. ordered Milligan to leave and Milligan replied, "I'm just really attracted to you."

N.P. was "in shock" and "scared" because she did not know Milligan very well and was concerned about "what might happen next." N.P. ordered Milligan to "get out." Milligan waited ten to fifteen seconds before removing his penis from N.P.'s vagina. Milligan proceeded to masturbate and ejaculate on N.P.'s bed before leaving the room.

Milligan was indicted on one count of first-degree sexual assault [1] and one count of second-degree sexual assault,[2] and he proceeded to trial before Superior Court Judge Ben Esch.

At trial, Milligan testified that, when N.P. had returned to the apartment, he had followed her into her bedroom and sat on the bed with her. Milligan testified that N.P. had told him he had a "nice body," and they had started touching and having sex. Milligan testified that he had told the police that he did not remember the previous night, and that he had made that statement to the police because he panicked.

The jury found Milligan guilty of first- and second-degree sexual assault, and Milligan now appeals.

### Discussion

*The evidence that N.P. suffered from alcohol-related memory loss was admissible.*

During cross-examination, N.P. denied that she had ever experienced "blackout." In response, Milligan asked the court to allow him to introduce evidence that N.P. had previously experienced alcohol-related memory losses. Milligan made an offer of proof based on the testimony of Chad Yates and Darlene Stumbaugh.

Yates testified that he had dated N.P. for a short period of time before and after the incident in this case. Yates testified that, on one occasion, he had been drinking with N.P. and she ended up staying at his house. The following morning, she had asked Yates how

---

1. AS 11.41.410(a)(1).

2. AS 11.41.420(a)(3).

they got home since she was unable to remember. On another occasion, Yates and N.P. came home from a bar and had sexual intercourse. Yates testified that N.P. had been talking and coherent at the time. But the following morning, N.P. could not remember whether she and Yates had had intercourse.

Stumbaugh testified that she worked with N.P. at Quyanna Care Center. Stumbaugh recalled that one morning N.P. had mentioned that she had had so much to drink that she was unsure how she got home the night before. Stumbaugh could not remember the exact date when N.P. had informed her of the incident, but recalled that the conversation had taken place before the incident with Milligan.

Judge Esch ruled that this evidence was inadmissible impeachment on a collateral issue. The judge also stated that the evidence regarding N.P.'s past memory loss constituted inadmissible propensity evidence. On appeal, Milligan contends that the trial court's decision excluding this evidence violated his due process right to present a defense.

■ Generally, a party may not introduce extrinsic evidence to contradict a witness's testimony if the extrinsic evidence relates to a collateral matter.[3] "If a matter is considered collateral, the testimony of the witness on direct or cross-examination stands—the examiner must take the witness's answer."[4] But a matter is not "collateral" if the matter is itself "relevant to a fact of consequence on the historical merits of the case."[5]

■ Judge Esch apparently recognized that evidence is not collateral if it is relevant to a material issue. But he ruled that the evidence that N.P. had suffered alcohol-related memory loss was "propensity" evidence barred by Evidence Rule 404(b)(1). Under this rule, evidence of a character trait is generally inadmissible to show that a person acted in conformity with that trait at the time in question.[6] For example, evidence that a witness is an alcoholic is generally regarded as character evidence, which is inadmissible to impeach a witness's credibility.[7]

■ On the other hand, evidence of flaws in a witness's memory and perception is generally admissible.[8] And evidence of a witness's mental condition may be relevant to the extent that the condition affects the witness's capacity to accurately perceive and recall an event.[9] The Illinois Court of Appeals concluded that some evidence of alcohol-related memory losses falls into this category:

> Where the proffered evidence is only that the witness is an alcoholic, it is doubtful whether it is a relevant matter for cross-examination. ... And it is clear that it may not be presented extrinsically to rebut the witness's denial since it is in the nature of general character impeachment ... Where, however, the proffered evidence is that the condition of alcoholism causes the witness to suffer blackouts when he drinks, and evidence has been presented that the witness was drinking near the time of the events of which he testifies, then the evidence is admissible as probative of the witness's sensory capacity.[10]

We agree with this reasoning. When there is evidence that a witness has been drinking

---

3. *Freeman v. State*, 486 P.2d 967, 979–80 (Alaska 1971).

4. *Worthy v. State*, 999 P.2d 771, 774 (Alaska 2000).

5. 1 Kenneth S. Broun et al., *McCormick on Evidence* § 49, at 235 & n. 13 (6th ed.2006) (citing *People v. Wadley*, 169 Ill.App.3d 1036, 120 Ill. Dec. 338, 523 N.E.2d 1249, 1257 (1988) ("The test to determine whether a matter is collateral is whether it could be introduced for any purpose other than to contradict.")).

6. *See Callahan v. State*, 769 P.2d 444, 446 (Alaska App.1989).

7. *See Dyer v. State*, 666 P.2d 438, 451 (Alaska App.1983).

8. *See Bakken v. State*, 489 P.2d 120, 124 (Alaska 1971).

9. *See Walden v. State, Dep't of Transp.*, 27 P.3d 297, 307 (Alaska 2001).

10. *People v. Di Maso*, 100 Ill.App.3d 338, 55 Ill.Dec. 647, 426 N.E.2d 972, 975 (1981) (citations omitted).

at the time of the incident in question, evidence that the witness suffered alcohol-related memory loss near that time is relevant to impeach the witness's memory and perception.[11]

In this case, there was evidence that N.P. had been drinking with her friends from at least 11:30 p.m. until 5:00 a.m. before the incident in question. Milligan's offer of proof included two or three occasions when N.P. had suffered from memory loss near the time of this incident. Darlene Stumbaugh would have testified that, shortly before this incident, N.P. told her that she had so much to drink that she could not remember how she got home. Chad Yates would have testified that, on one occasion, after a night of drinking, N.P. asked him how they got home. Yates would also have testified that on another occasion, after a night of drinking, N.P. could not remember that she and Yates had intercourse, even though she had been talking and coherent at the time. The evidence of these other incidents was admissible to impeach N.P.'s memory and perception.

When evidence is erroneously excluded, we ask whether the absence of the evidence had a substantial effect on the jury's verdict.[12] In this case, the excluded evidence was relevant to a central issue. N.P. testified that she had been sleeping when Milligan began to sexually assault her. Milligan testified that N.P. was awake and that she consented to sexual intercourse. To reconcile this testimony, Milligan argued that N.P. had alcohol-related memory loss when she agreed to have intercourse with him. But Milligan's argument was directly contrary to N.P.'s testimony that she had never suffered an alcohol-related memory loss.

The trial judge's ruling left Milligan without any evidence to support his argument. But if the trial court had admitted the testimony from Stumbaugh and Yates, then Milligan would have had an evidentiary basis for his argument that N.P.'s memory and perception were compromised. We therefore conclude that we must reverse Milligan's convictions because this error may have appreciably affected the jury's verdict.

*The State presented sufficient evidence to support Milligan's indictment for first-degree sexual assault.*

Milligan also argues that the State presented insufficient evidence to the grand jury to support the charge of first-degree sexual assault. Milligan argues that there was no evidence that Milligan threatened N.P. with harm, and that there was no evidence to show that N.P. was coerced.

When we consider a challenge to the sufficiency of the evidence supporting an indictment, we draw "every legitimate inference" in favor of the indictment.[13] There is sufficient evidence to support an indictment if, "viewed in the light most favorable to the indictment," the evidence "is adequate to persuade reasonable minded persons that if unexplained or uncontradicted it would warrant a conviction of the person charged with an offense by the judge or jury trying the offense."[14]

Under AS 11.41.410(a)(1), "[a]n offender commits the crime of sexual assault in the first degree if the offender engages in sexual penetration with another person without consent of that person." "[W]ithout consent" means that a person, "with or without resisting, is coerced by the use of force against a person or property, or by the express or implied threat of death, imminent physical injury, or kidnapping to be inflicted on anyone."[15]

We addressed this issue under similar facts in *Nicholson v. State,* where a teenage girl woke to find the defendant naked in bed

---

11. *Id.; see also State v. Francis,* 267 Conn. 162, 836 A.2d 1191, 1201 (2003); *State v. Hawkins,* 260 N.W.2d 150, 158 (Minn.1977).

12. *See David v. State,* 123 P.3d 1099, 1102 (Alaska App.2005); *Love v. State,* 457 P.2d 622, 631–32 (Alaska 1969) (the test for whether an evidentiary ruling is harmless error is whether the error had an appreciable effect on the jury's verdict).

13. *Cleveland v. State,* 258 P.3d 878, 881 (Alaska App.2011) (quoting *State v. Williams,* 855 P.2d 1337, 1346 (Alaska App.1993)).

14. *Cleveland,* 258 P.3d at 881 (quoting *State v. Parks,* 437 P.2d 642, 644 (Alaska 1968)).

15. AS 11.41.470(8)(A).

with her, fondling her breasts.[16] At trial, the girl testified that she had hesitated to resist because she was in shock and was scared that the defendant might hurt her.[17] We concluded that the jury could find that the girl's "momentary acquiescence in Nicholson's fondling her breast was 'coerced by an implicit threat of imminent physical injury' and thus constituted second-degree sexual assault." [18]

Similarly, in *Ritter v. State*, the defendant was charged with four counts of second-degree sexual assault for engaging in sexual contact with four clients while working as a massage therapist.[19] We concluded that the defendant "could reasonably have foreseen that the circumstances of the massage therapy would make his victims afraid to protest or resist: they were alone with him, they were undressed, and it was not feasible to run outside into the cold." [20] We concluded that this evidence was therefore sufficient to support the jury's conclusion that the sexual contact was "without consent." [21]

■ Milligan asks us to reexamine our holdings in *Nicholson* and *Ritter*. We are not convinced that we should do so. These holdings appear to control our ruling on this issue. N.P. testified that she had gone to bed alone, then awoke to find Milligan on top of her, with his penis in her vagina. N.P. testified that she had been shocked and frightened because she did not know Milligan very well and did not know what Milligan would do to her. This evidence was sufficient to allow the grand jury to conclude that N.P. was temporarily coerced to allow this sexual conduct to continue by an implicit threat of imminent physical injury. And this conclusion supports the charge of first-degree sexual assault.

*The State did not withhold exculpatory evidence from the grand jury.*

**16.** 656 P.2d 1209, 1210 (Alaska App.1982).

**17.** *Id.* at 1213.

**18.** *Id.*

**19.** 97 P.3d 73, 74 (Alaska App.2004).

**20.** *Id.* at 77–78.

**21.** *Id.* at 74, 78.

■ Milligan also asserts that the State failed to present exculpatory evidence to the grand jury with respect to the charge of first-degree sexual assault. He argues that the State failed to present evidence that N.P. told the investigating officers and a SART examiner that Milligan had immediately removed his penis from her vagina after she told him to get off of her. N.P.'s testimony to the grand jury was that Milligan had removed his penis a couple seconds after she told Milligan to stop.

■ Alaska Rule of Criminal Procedure 6(q) requires a prosecutor to present exculpatory evidence to the grand jury.[22] But the prosecutor is only obligated to present evidence that tends, in and of itself, to negate the defendant's guilt.[23] "The mere fact of inconsistency does not automatically convert all such evidence into exculpatory material." [24]

N.P.'s statements to the investigating officers and the SART examiner are merely inconsistent with N.P.'s testimony before the grand jury. This evidence was not substantially favorable because the inconsistency does not tend, in and of itself, to negate Milligan's guilt.

*The lower court must determine whether Officer Redburn made a "negligent omission" during his grand jury testimony.*

Before trial, Milligan moved to dismiss the charge of second-degree sexual assault. Milligan argued that Officer Byron Redburn had negligently omitted material information when he testified to the grand jury about Milligan's statements to two other police officers. Milligan contends that Redburn was misleading when he testified that Milligan told the officers that N.P. might have been passed out when they had sex, without noting

**22.** *Frink v. State,* 597 P.2d 154, 164–65 (Alaska 1979).

**23.** *State v. McDonald,* 872 P.2d 627, 639 (Alaska App.1994).

**24.** *Preston v. State,* 615 P.2d 594, 602 (Alaska 1980).

that, in another part of the interview, Milligan denied that N.P. was passed out.

In his ruling on Milligan's motion, Judge Esch compared the transcript of Milligan's interview with the testimony offered to the grand jury. The judge found that, during the interview, in response to an open-ended question about the incident, Milligan stated, "Yeah, we was out at [the] Polaris. We all went back to her place. We was drinkin' . . . and the next thing you know everybody was just passed out."

The judge also found that, later in the interview, the police asked Milligan about his knowledge of whether N.P. was passed out:

> *Chief Burke:* Did she say anything to you?
>
> *Milligan:* She didn't say shit.
>
> *Chief Burke:* Okay, could she have been passed out?
>
> *Milligan:* Very well, as I—I was. Like, I was not, it was not . . . it was not a situation where, I mean we was all drinking, everybody was drinking.

Milligan began to further discuss his drinking that evening, but Chief Burke interrupted him and asked him again whether N.P. had said anything during the sexual act. Milligan said no, and Chief Burke asked again whether N.P. might have been passed out:

> *Chief Burke:* Could she have been passed out?
>
> *Milligan:* No. She—I mean, she couldn't have been passed out, because . . .
>
> *Chief Burke:* Had she been drinking a lot?
>
> *Milligan:* Everybody was drinking. Like I said . . . .

Milligan then stated that N.P. consumed the least amount of alcohol out of the individuals present that evening and noted that N.P. drove other people home.

The record also indicates that Officer Harreus prepared a police report that summarized Milligan's interview. Harreus's report stated that, when Chief Burke asked Milligan if N.P. had been passed out when Milligan had sex with her, Milligan replied, "very well as I was" and "she could have been passed

out." Harreus's report does not note that Milligan later denied that N.P. was passed out.

During the grand jury proceeding, Officer Byron Redburn was asked to summarize the statements Milligan made to the police following his arrest. Redburn testified that Milligan's story had evolved. At first Milligan denied that he had sex with N.P. Then he admitted that they had sex, but insisted that he would have stopped if she had said to stop. Then he admitted that he did stop, and then masturbated on the bed.

The prosecutor asked Redburn, "Did anyone ask [Milligan] whether or not [N.P.] was passed out when he had sex with her?" Redburn replied that Officer Harreus and Chief Burke had asked that question. Redburn explained, "[I]t seems to me his response was along the lines of, 'She might have been.' "

Milligan argues that Redburn's testimony constituted inadmissable hearsay evidence. Ordinarily, hearsay evidence may not be presented to the grand jury without compelling justification.[25] But the legislature amended this rule in 1994 to allow a police officer to summarize the statements of other officers who participate in a criminal investigation.[26] Alaska Criminal Rule 6(r)(3) now allows hearsay evidence to be presented to the grand jury if:

> (i) the individual presenting the hearsay evidence is a peace officer involved in the investigation; and (ii) the hearsay evidence consists of the statement and observations made by another peace officer in the course of an investigation; and (iii) additional evidence is introduced to corroborate the statement.

However, the rule also provides that, if the testimony presented by a peace officer to the grand jury "is inaccurate because of intentional, grossly negligent, or negligent misstatements or omissions, then the court shall dismiss an indictment resulting from the testimony if the defendant shows that the inac-

---

**25.** Alaska R.Crim. P. 6(r)(1).

**26.** *See* SLA 1994, ch. 114, § 2.

curacy prejudices substantial rights of the defendant." [27]

■ Judge Esch initially concluded that Redburn's testimony was not hearsay. He reasoned that a criminal defendant's statements are generally admissible as the statement of a party opponent.[28] We agree that Milligan's statements to the other officers were not hearsay. But the judge's analysis did not account for a second layer of hearsay.[29] Redburn's testimony about the content of the other officers' reports would be hearsay if offered for the proof of those reports. Thus, Redburn's hearsay summary appears to fall directly within the scope of Criminal Rule 6(r)(3).

In an alternative ruling, Judge Esch concluded that Redburn did not make any "misstatements" within the meaning of this rule. The judge found that, during Milligan's interview, he had first stated that everybody was passed out, then acknowledged that N.P. might have been passed out, then denied that she could have been passed out. The judge concluded that Redburn's testimony was not a misstatement of Milligan's interview because Redburn accurately described Milligan's second statement on this issue—the statement that suggested that N.P. might have been passed out.

■ We conclude that the trial judge's analysis was incomplete. Under Criminal Rule 6(r)(3), an officer's summary may be "inaccurate" even if the testimony does not contain an outright misstatement. Under the text of this rule, an officer's testimony may also be inaccurate if it contains "negligent omissions." And Redburn's failure to mention Milligan's third statement on this issue—the statement denying that N.P. was passed out—could have been a negligent omission under this rule.

We cannot tell from this record whether Redburn's testimony was a negligent omission. It may be necessary for the superior court to hold an evidentiary hearing to resolve this issue. And if the court concludes that Redburn's testimony was a negligent omission, then it must also consider whether this inaccuracy prejudiced Milligan's substantial rights. These issues must be resolved before the superior court can determine whether to dismiss the charge of second-degree sexual assault.

### Conclusion

In view of our disposition, we are not required to address the other issues raised in Milligan's appeal. We REVERSE the superior court's judgment of conviction and REMAND for further proceedings consistent with this opinion.

---

27. Alaska R.Crim. P. 6(r)(4).

28. Alaska Evid. R. 801(d)(2).

29. *Cf. Snyder v. Foote*, 822 P.2d 1353, 1360 (Alaska 1991) (noting that hearsay within hearsay is admissible only if each part of the combined statement is admissible as an exception to the hearsay rule).